# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
January 13, 2015 Session

## IN RE AGUSTINE R., ET. AL.[1]

### Appeal from the Juvenile Court for Sevier County
### Nos. 130162, 130163    Hon. Jeffrey D. Rader, Judge

---

### No. E2014-01091-COA-R3-PT-FILED-MARCH 17, 2015

---

This is a termination of parental rights appeal brought by the father. The trial court found clear and convincing evidence to support termination of the father's parental rights on the statutory grounds of abandonment for failure to remit child support and failure to comply with the permanency plans. The court also found that termination of the father's parental rights was in the best interest of the children. The father appeals. We affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed; Case Remanded

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., C.J., and THOMAS R. FRIERSON, II, J., joined.

James R. Hickman, Jr., Sevierville, Tennessee, for the appellant, Juan A. R.

Robert E. Cooper, Jr., Attorney General and Reporter, and Laura Miller, Assistant Attorney General, Nashville, Tennessee, for the appellee, State of Tennessee, Department of Children's Services.

---

[1] This court has a policy of protecting the identity of children in parental rights termination cases by initializing the last name of the parties. The record reveals that the proper spelling of the juvenile's name is "Agustine," not "Augustine" as spelled on several court documents.

**OPINION**

**I. BACKGROUND**

Agustine R. and Elizabeth R. (collectively "the Children") were to born to Elizabeth O. ("Mother") and Juan R. ("Father") in July 1999 and December 2000, respectively. The Children were born in Sevierville, Tennessee. Mother and Father (collectively "the Parents") were illegal immigrants. At some point, Mother returned to Mexico voluntarily, while Father was arrested and was subsequently deported to Mexico. The Children resided with friends and relatives until the Tennessee Department of Children's Services ("DCS") took custody of the Children in March 2010. The Children were adjudicated as dependent and neglected, based upon the inability of the Parents to legally return and care for the Children.

Despite the inability of the Parents to return to the United States, the record reflects that DCS developed approximately eight permanency plans from May 2010 until December 2013. These plans were ratified by the trial court. Father participated in the development of several of the permanency plans with the aid of an interpreter provided by DCS. He was also provided with written copies of the Criteria and Procedures for Termination of Parental Rights in Spanish. Pursuant to the plans, Father was required to complete an alcohol and drug assessment and follow all recommendations; attend domestic violence classes and submit proof of completion; provide proof of finances and report any changes in housing, employment, income, and transportation; write letters to the Children to establish a relationship; provide DCS with a current address; contact DCS if he returned to the United States; and comply with random drug screening if he returned to the United States. DCS initially sought to return the Children to the Parents or to place the Children with relatives; however, the Children were moved to an adoptive foster home when DCS was unable to find a suitable relative placement.

Father completed an alcohol and drug assessment and provided documentation to establish that the Mexican Consulate had found his home suitable for the Children. In 2012, DCS requested proof that Father's residence remained appropriate after he was involved in an altercation at his residence. At some point, Father ceased communications with DCS. DCS filed a petition to terminate Father's parental rights on April 13, 2012. The petition was later dismissed at the request of DCS.

Following Father's continued failure to comply with the majority of the requirements contained in the permanency plans and to maintain communication, DCS filed a second

petition to terminate his parental rights to the Children on February 4, 2013.[2] DCS alleged that termination of Father's parental rights was supported by the statutory grounds of abandonment for failure to remit child support and substantial noncompliance with the permanency plans. Father was provided notice of the upcoming hearing on the termination petition by publication in Tennessee and California because DCS could not determine Father's current whereabouts. When DCS last spoke with Father, he was in California; however, they received subsequent information indicating that he may have moved back to Tennessee. In any event, Father did not appear at the hearing on May 14, 2014.

Elizabeth, who was 13 years old at the time of the hearing, testified that she had lived with her foster parents for approximately two and a half years. She enjoyed a "[p]retty good" relationship with her foster parents and hoped to be adopted by them. She claimed that her brother also wished to be adopted by their foster parents. She acknowledged that she had several siblings in Mexico and that she hoped to establish a relationship with them. She could not remember the last time she spoke with her biological father. She acknowledged that she refused his telephone call on one of her birthdays. She explained that she was afraid to speak with him because several people had told her about his treatment of her mother and because she had also witnessed behavior that made her uncomfortable.

Carol Davis testified that she had been assigned as the case manager for the Children since August 2010. She explained that the Children were taken into DCS custody when they were left without a legal guardian. She asserted that she attempted to assist Father in regaining custody and that she had even contracted for the services of an interpreter on approximately 14 occasions, 2 of which were prior to the filing of the termination petition at issue. She claimed that he even participated in some of the permanency planning meetings with the aid of an interpreter and that she mailed a translated version of the Criteria and Procedures for Termination of Parental Rights to him. She stated that she also completed a relative home study in California but that the residence was not approved as a placement. She acknowledged that she moved for dismissal of the original termination petition because she wanted to provide further assistance to Father given the unique nature of the case.

Ms. Davis testified that she advised Father of his duty to provide child support but that he never remitted any form of support for the Children. She stated that Father worked for Ruby Tuesday while he resided in the United States and that he was employed at a factory when he returned to Mexico. Father never claimed to suffer from a disability or stated that he was unable to find employment.

---

[2]DCS also sought to terminate Mother's parental rights to the Children. She did not appear at the termination hearing at which her rights were terminated. She is not a party to this appeal.

Ms. Davis testified that she communicated with the United States State Department in an effort to arrange visitation for the Children. She explained that her attempt to arrange visitation was unsuccessful because she would not have the ability to ensure the Children's safe return to the United States. She acknowledged that Father completed a home study through the Mexican Consulate and that his residence had been approved. She conceded that he also attended Alcoholic's Anonymous and submitted proof of a clean drug screen in June 2011. She stated that she did not return the Children because he had not completed the remainder of the permanency plan requirements and because she learned of another domestic violence incident that occurred in September 2012. She stated that Father denied the seriousness of the allegations.

Ms. Davis testified that she last spoke with Father in September 2013, when he advised her that he was residing in California with his sister and working on a freight truck. He expressed a desire to regain custody of the Children or have them placed with relatives, but he informed her that he would not return to court because he feared deportation. She advised him that the prospective relative placement would have to contact DCS. She asserted that she never received any further communication from Father or a relative that desired custody of the Children. She claimed that the Children currently resided in a loving, supportive foster home with parents that wished to adopt them.

Foster Mother testified that the Children had resided with her family for nearly three years and that she and her family hoped to adopt them.

Following the presentation of the above evidence, the trial court found that DCS had made reasonable efforts to assist Father and that the overall effort expended on Father's case was "unprecedented." The court terminated Father's parental rights on the statutory grounds of abandonment for failure to remit child support and substantial noncompliance with the permanency plans. The court further held that termination of Father's parental rights was in the best interest of the Children. This timely appeal followed.

## II. ISSUES

We consolidate and restate the issues raised on appeal by Father as follows:

A. Whether clear and convincing evidence supports the court's termination of Father's parental rights based upon the statutory ground of abandonment for failure to remit support pursuant to Tennessee Code Annotated section 36-1-102(1)(D).

B. Whether clear and convincing evidence supports the court's termination of Father's parental rights based upon his substantial noncompliance with the permanency plans pursuant to Tennessee Code Annotated section 36-1-113(g)(2).

C. Whether clear and convincing evidence supports the court's finding of reasonable efforts by DCS pursuant to Tennessee Code Annotated section 37-1-166(g)(1).

D. Whether clear and convincing evidence supports the court's finding that termination of Father's parental rights was in the best interest of the Children pursuant to Tennessee Code Annotated section 36-1-113(i).

## III. STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). This right "is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re M.J.B.*, 140 S.W.3d 643, 652-53 (Tenn. Ct. App. 2004). "Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent." *Means v. Ashby*, 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003) (quoting Tenn. Code Ann. § 36-1-113(I)(1)). "'[F]ew consequences of judicial action are so grave as the severance of natural family ties.'" *M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787 (1982)).

While parental rights are superior to the claims of other persons and the government, they are not absolute and may be terminated upon appropriate statutory grounds. *See Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). Due process requires clear and convincing evidence of the existence of the grounds for termination of the parent-child relationship. *In re Drinnon*, 776 S.W.2d at 97. A parent's rights may be terminated only upon

(1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2) [t]hat termination of the parent's or guardian's rights is in the best interest [] of the child.

Tenn. Code Ann. § 36-1-113(c). "[A] court must determine that clear and convincing evidence proves not only that statutory grounds exist [for the termination] but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The existence of at least one statutory basis for termination of parental rights will support the trial court's decision to terminate those rights. *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000), *abrogated on other grounds by In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005).

The heightened burden of proof in parental termination cases minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable. *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. Aug. 13, 2003). This evidence also eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546; *In re S.M.*, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004); *In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d at 474.

In 2010, the Tennessee Supreme Court provided guidance to this court in reviewing cases involving the termination of parental rights:

A reviewing court must review the trial court's findings of fact de novo with a presumption of correctness under [Rule 13(d) of the Tennessee Rules of Appellate Procedure]. *See In re Adoption of A.M.H.*, 215 S.W.3d [793,] 809 [(Tenn. 2007)]. In light of the heightened burden of proof in proceedings under [Tennessee Code Annotated section] 36-1-113, the reviewing court must then make its own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim. *State Dep't of Children's Servs. v. Mims*, 285 S.W.3d [435,] 447-48 [(Tenn. Ct. App. 2008)]; *In re Giorgianna H.*, 205 S.W.3d 508, 516 (Tenn. Ct. App. 2006); *In re S.M.*, 149 S.W.3d 632, 640 n. 13 (Tenn. Ct. App. 2004).

-6-

> Appellate courts conduct a de novo review of the trial court's decisions regarding questions of law in termination proceedings. However, these decisions, unlike the trial court's findings of fact, are not presumed to be correct. *In re Angela E.*, 303 S.W.3d [240,] 246 [(Tenn. 2010)]; *In re Adoption of A.M.H.*, 215 S.W.3d at 809.

*In re Bernard T.*, 319 S.W.3d 586, 596-97 (Tenn. 2010).

## IV. DISCUSSION

### A.

Father asserts that the trial court erred in terminating his parental rights on the statutory ground of abandonment for failure to remit child support. He argues that DCS failed to provide any evidence concerning his ability to work or provide support during the relevant four-month time period. DCS responds that the trial court did not err in finding that Father willfully failed to support the Children when the record contained ample circumstantial proof to establish that Father was capable of maintaining employment and had maintained employment at various times following the Children's placement in DCS custody.

In terminating Father's parental rights based upon the statutory ground of abandonment, the court considered Father's failure to remit support for the four months preceding February 4, 2013, the filing date of the termination petition. Thus, the relevant time period was October 3, 2012 to February 3, 2013. A parent's willful failure to support the child "means the willful failure, for a period of four (4) consecutive months, to provide monetary support or the willful failure to provide more than token payments toward the support of the child." Tenn. Code Ann. § 36-1-102(1)(D). Token support is defined as "support, under the circumstances of the individual case, [that] is insignificant given the parent's means." Tenn. Code Ann. § 36-1-102(1)(B).

This court has consistently held that the term willfulness as it applies to a party's failure to support must contain the element of intent. *In re Swanson*, 2 S.W.3d 180, 188-89 (Tenn. 1999). The element of intent utilized in termination proceedings "does not require the same standard of culpability as is required by the penal code." *Audrey S.*, 182 S.W.3d at 863. "Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent." *Id.* "[A] person acts 'willfully' if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing." *Id.* at 863-64. Additionally, "'[f]ailure to support a child is 'willful' when a person is aware of his or her duty to support, has the capacity to provide the support, makes no attempt to provide the support, and has no justifiable excuse for not providing the support.'" *In re M.L.D.*, 182

S.W.3d 890, 896 (Tenn. Ct. App. 2005) (quoting *In re Adoption of T.A.M.*, No. M2003-02247-COA-R3-PT, 2004 WL 1085228, at *4 (Tenn. Ct. App. May 12, 2004)).

We acknowledge Father's illegal status in this country. However, this was not a case where a parent had extenuating circumstances but faithfully provided support when he or she was able. *See In re Dylan H.*, No. E2010-01953-COA-R3-PT, 2011 WL 6310465, at *7 (Tenn. Ct. App. Dec. 16, 2011) (reversing the trial court's termination decision because mother was simply unable to fulfill her child support obligation during the relevant time period). In this case, Father never paid child support or even provided token support or gifts since the Children were removed and placed in DCS custody. He specifically advised DCS that he was employed in Mexico as a factory worker following his deportation. The record reveals that he was also employed at a gas station in Mexico in May 2013 and that he eventually returned to the United States and was employed in California when he last spoke with DCS. Father simply failed to remit any form of support for the Children even when he was admittedly capable of working and actually employed at various times. With these considerations in mind, we conclude that there was clear and convincing evidence to establish that Father abandoned the Children by willfully failing to remit child support before, during, and after the relevant time period and that a statutory ground existed for termination of Father's parental rights.

B.

Father argues that the trial court erred in terminating his parental rights on the statutory ground of substantial noncompliance with the permanency plans. He asserts that he made efforts to comply with the requirements as evidenced by his attendance at Alcoholic's Anonymous, his clean drug screen in June 2011, and his submission of a home study providing that his home was appropriate for the Children. DCS responds that the trial court properly found that Father failed to substantially comply with the requirements contained in the permanency plans.

Tennessee law requires the development of a plan of care for each foster child and further requires that the plan include parental responsibilities that are reasonably related to the plan's goal. Tenn. Code Ann. § 37-2-403(a)(2)(A). A ground for termination of parental rights exists when a petitioner proves by clear and convincing evidence that "[t]here has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan." Tenn. Code Ann. § 36-1-113(g)(2). To establish noncompliance, the trial court must initially find "that the requirements of the permanency plans are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place." *In re M.J.B.*, 140 S.W.3d at 656; *see In re Valentine*, 79 S.W.3d at 547. When the trial court does not make such findings, the appellate court should review

the issue de novo. *In re Valentine*, 79 S.W.3d at 547. Second, the court must find that the parent's noncompliance is substantial, *In re M.J.B.*, 140 S.W.3d at 656, meaning that the parent must be in "noncompliance with requirements in a permanency plan that are reasonable and related to remedying the conditions that warranted removing the child from the parent's custody." *In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at *12 (Tenn. Ct. App. June 3, 2003). To assess a parent's substantial noncompliance with a permanency plan, the court must weigh "both the degree of noncompliance and the weight assigned to that particular requirement." *In re Z.J.S.*, 2003 WL 21266854, at *12. Conversely, "[t]erms which are not reasonable and related are irrelevant, and substantial noncompliance with such terms is irrelevant." *In re Valentine*, 79 S.W.3d at 548-49.

The permanency plans at issue in this case were not particularly lengthy or hard to follow. Ms. Davis provided Father with interpreters and continually advised him on the steps he needed to take to reunite with the Children and the potential consequences of his failure to complete the necessary steps. This is not a case where Father diligently completed requirements to the best of his ability. Father's attempts to comply were sporadic, at best. Moreover, he simply failed to complete the most important aspects of the permanency plans, to provide current proof that his home was safe for the Children. Ms. Davis attempted to assist Father to the best of her ability given the unique circumstances, but Father essentially disappeared prior to the termination proceedings. Accordingly, we conclude that while Father attempted to comply with some of the requirements enumerated in the permanency plans, the court's finding that Father was in substantial noncompliance with the permanency plans is supported by clear and convincing evidence. Thus, a second statutory ground existed for termination of Father's parental rights.

C.

Father takes issue with DCS's failure to assist him in reuniting with the Children. Ordinarily, we would address the reasonableness of DCS's efforts as a stand-alone issue in determining whether sufficient grounds existed to support the termination of his parental rights. However, during the pendency of this action, the Supreme Court issued an opinion in which it specifically overruled the progeny of cases requiring "DCS to prove by clear and convincing evidence that it made reasonable efforts to reunify as a precondition to termination of parental rights." *In re Kaliyah S.*, — S.W.3d —, No. E2013-01352-SC-R11-PT, 2015 WL 273659, at *18, n. 34 (Tenn. Jan. 22, 2015); *see also In re Robert C.*, No. M2014-00702-COA-R3-PT, 2015 WL 478991, at *8-9 (Tenn. Ct. App. February 3, 2015) (addressing the Court's opinion). The Supreme Court stated,

"[I]n a termination proceeding, the extent of DCS's efforts to reunify the family is weighed in the court's best-interest analysis, but proof of reasonable

efforts is not a precondition to termination of the parental rights of the respondent parent. As with other factual findings made in connection with the best-interest analysis, reasonable efforts must be proven by a preponderance of the evidence, not by clear and convincing evidence. *In re Audrey S.*, 182 S.W.3d at 861. After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest. *See In re Adoption of Kleshinski*, No. M2004-00986-COA-R3-CV, 2005 WL 1046796, at *17 (Tenn. Ct. App. May 4, 2005) (citing *In re M.J.B.*, 140 S.W.3d 643, 654 (Tenn. Ct. App. 2004)); *see also In re Giorgianna H.*, [205 S.W.3d 508, 519 (Tenn. Ct. App. 2006)]; *Tenn. Dep't of Children's Servs. v. T.M.B.K.*, 197 S.W.3d 282, 288 (Tenn. Ct. App. 2006).

*Id.* at *18. Accordingly, we will address the reasonableness of DCS's efforts in the best interest analysis.

D.

Having concluded that there was clear and convincing evidence supporting the statutory grounds to terminate Father's parental rights, we must consider whether termination of his rights was in the best interest of the Children. In making this determination, we are guided by the following non-exhaustive list of factors:

(i) In determining whether termination of parental or guardianship rights is in the best interest of the child . . . the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to [section] 36-5-101.

Tenn. Code Ann. § 36-1-113(i). "This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's parental rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). The General Assembly has also stated that "when the best interest[] of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interest[] of the child, which interests are hereby recognized as constitutionally protected." Tenn. Code Ann. § 36-1-101(d); *see also White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004) (holding that when considering a child's best interest, the court must take the child's perspective, rather than the parent's).

A number of the best interest factors weigh against Father. He had not made the adjustment of circumstances necessary to provide a stable home for the Children as evidenced by his refusal to address the domestic violence allegations and to provide DCS with current information regarding his residence. Tenn. Code Ann. § 36-1-113(i)(1). He failed to visit or even maintain a relationship with the Children through regular telephone calls or letters. Tenn. Code Ann. § 36-1-113(i)(3), (4). The Children reside in a safe and stable foster home that expressed a desire to adopt them. Tenn. Code Ann. § 36-1-113(i)(5).

Questions remain as to whether Father can provide a safe and stable home. Tenn. Code Ann. § 36-1-113(i)(7). Father never remitted child support. Tenn. Code Ann. § 36-1-113(i)(9). Relative to DCS's efforts, Ms. Davis presented several affidavits documenting her efforts to reunite the Children with Father. The affidavits reflect her attempts to contact Father and provide services to the best of her ability given the unique circumstances of the case. Having reviewed the evidence, we conclude that DCS expended reasonable efforts in attempting to assist Father, who was extremely difficult to locate and never made a sufficient corresponding effort to remedy the conditions which led to the Children's placement with DCS. Tenn. Code Ann. § 36-1-113(i)(2).

We acknowledge Father's predicament given his illegal status in this country. However, Father returned to the United States and did not bother to communicate with the Children or to provide DCS with current information. The Children, now teenagers, need permanency and stability, which they can receive from the foster parents who have successfully parented them while Father allowed the Children to languish in custody. Indeed, Elizabeth expressed a desire to remain with her foster parents and achieve permanency through adoption. With all of the above considerations in mind, we conclude that there was clear and convincing evidence to establish that termination of Father's parental rights was in the best interest of the Children. Accordingly, we affirm the decision of the trial court.

## V. CONCLUSION

The judgment of the trial court is affirmed, and the case is remanded for such further proceedings as may be necessary. Costs of the appeal are taxed to the appellant, Juan A. R.

_____
JOHN W. McCLARTY, JUDGE

-12-